# FEDERAL ENERGY REGULATORY COMMISSION *v.* MARTIN EXPLORATION MANAGEMENT CO. ET AL.

No. 87–363.   Argued March 28, 1988—Decided May 31, 1988*

---

*Together with No. 87–364, *Public Service Commission of the State of New York et al.* v. *Martin Exploration Management Co. et al.*, also on certiorari to the same court.

BRENNAN, J., delivered the opinion of the Court, in which all other Members joined, except WHITE, J., who took no part in the consideration or decision of the cases.

*Richard G. Taranto* argued the cause for petitioner in No. 87–363. With him on the briefs were *Acting Solicitor General Ayer, Deputy Solicitor General Cohen, Catherine C. Cook, Jerome M. Feit, Joel M. Cockrell,* and *John H. Conway. Richard A. Solomon* argued the cause for petitioners in No. 87–364. With him on the briefs were *Mark N. Mutterperl, Terence J. Collins, Robert Ballentine, Raymond N. Shibley, Frederick Moring,* and *Herbert J. Martin. John E. Holtzinger, Jr., Joseph E. Stubbs, Loren S. Meltzer, Stephen E. Williams, Georgia B. Carter, David E. Weatherwax,* and *Mark G. Magnuson* filed a brief for CNG Transmission Corp. as respondent under this Court's Rule 19.6, in support of petitioners.

*Jeffrey S. Davidson* argued the cause for respondents in both cases. With him on the brief were *Stephen A. Herman, Michael L. Pate, Charles H. Shoneman, John L. Williford, Charles L. Pain, Harris S. Wood, James B. Atkin, David J. Evans, C. Roger Hoffman, Douglas W. Rasch, R. Gordon Gooch, Ronald D. Hurst, Paul W. Hicks, John McDonald, Richard E. Powers, Jr., Kenneth L. Riedman, Thomas G. Johnson,* and *Constance D. Coleman.*†

JUSTICE BRENNAN delivered the opinion of the Court.

These cases involve natural gas covered by overlapping provisions of the Natural Gas Policy Act of 1978—one setting a price ceiling, the other declaring prices deregulated. Petitioners contend that under § 101(b)(5) of the Act such gas should be classified as deregulated gas. The United States Court of Appeals for the Tenth Circuit held that under

---

†Briefs of *amici curiae* urging reversal were filed for the Interstate Natural Gas Association of America by *John H. Cheatham III;* and for Williams Natural Gas Co. by *Dale A. Wright, James T. McManus, Michael E. Small, Bobby Potts,* and *John Cary.*

§ 101(b)(5) such gas falls under whichever classification affords producers the highest price under their contracts and current market conditions. The Court of Appeals also held invalid a Federal Energy Regulatory Commission (FERC) ruling that certain "new tight formation gas" under § 107 (c)(5) of the Act is automatically "new" gas qualified for deregulated treatment under § 102(c) or § 103 of the Act. We reverse on both issues.

## I

From 1938 to 1978, the Federal Government regulated only the interstate natural gas market. By the 1970's, however, shortages in the interstate market developed because gas producers could get higher prices in unregulated intrastate markets. Two conflicting legislative solutions were developed: the Senate passed a bill deregulating interstate gas, S. 2104, 95th Cong., 1st Sess. (1977); the House passed a bill extending federal regulation to intrastate gas, H. R. 8444, 95th Cong., 1st Sess. (1977). The Conference Committee struck a compromise. H. R. Conf. Rep. No. 95–1752 (1978). The result was the Natural Gas Policy Act of 1978 (Act), Pub. L. 95–621, 92 Stat. 3351, 15 U. S. C. § 3301 *et seq.*

The Act defines various categories of gas spanning both interstate and intrastate gas, and creates a two-part system of phased deregulation. First, the Act establishes price ceilings for wellhead first sales of gas that vary with the applicable category of gas and that gradually increase over time. §§ 101–110, 15 U. S. C. §§ 3311–3320. Second, the Act establishes a three-stage elimination of price ceilings for certain categories: the price ceilings for certain "high-cost" gas were eliminated in 1979, for certain "old" intrastate gas and "new" gas in 1985, and for certain other "new" gas in 1987. See § 121, 15 U. S. C. § 3331.

Many of these categories overlap. Recognizing the overlap, Congress provided in § 101(b)(5) of the Act, 15 U. S. C. § 3311(b):

"If any natural gas qualifies under more than one provision of this title providing for any maximum lawful price or for any exemption from such a price with respect to any first sale of such natural gas, the provision which could result in the highest price shall be applicable."

In anticipation of the 1985 deregulation, FERC promulgated a regulation interpreting §§ 121 and 101(b)(5) to mean that any gas that was qualified for both deregulated and regulated treatment would be treated as deregulated. 18 CFR § 270.208 (1987).

This preference for deregulatory treatment adversely affected many gas producers who had entered into certain types of long-term contracts. Typically, these contracts had one clause setting the price if the gas were regulated and another clause setting the price if it were deregulated. The contract price for regulated gas was typically close to the price ceiling; the contract price for deregulated gas was typically based on market prices or left open to renegotiation. Because by 1984 the market price of natural gas had plunged below the regulated price ceilings, these producers stood to reap higher contractual prices if their gas was regulated than if it were deregulated.

Dissatisfied with FERC's regulation, numerous producers petitioned for review to the United States Court of Appeals for the Tenth Circuit. The Court of Appeals rejected FERC's interpretation of §§ 121 and 101(b)(5), adopting the producers' position that § 101(b)(5) unambiguously requires the applicable category to be that which, at any particular moment, garners the producer the highest contract price for its gas. 813 F. 2d 1059 (1987). In explaining this holding, the Court of Appeals also rejected FERC's ruling that certain "new tight formation gas" subject to regulation under § 107(c)(5), 15 U. S. C. § 3317(c)(5), is automatically qualified for deregulation as new gas under § 102(c) or § 103, 15 U. S. C. §§ 3312, 3313. See 813 F. 2d, at 1069–1070. We granted certiorari. 484 U. S. 962 (1987).

## II

"The plain meaning of the statute decides the issue presented." *Bethesda Hospital Assn.* v. *Bowen,* 485 U. S. 399, 403 (1988). The Act states that "the provision which *could* result in the highest price shall be applicable." § 101(b)(5) (emphasis added). It does not state that the applicable provision is that which *will* (depending on actual contracts and daily market prices) result in the highest price for each producer. We think these words call for a simple comparison between the highest price permitted by one provision and the highest price permitted by another: the higher the price ceiling, the higher the price that "could result" under the provision. The provision with the highest price ceiling thus applies uniformly to all producers selling gas that falls within both provisions. When one of the provisions sets no price ceiling at all—*i. e.,* it deregulates—that provision governs.

The Court of Appeals rejected this straightforward interpretation on the ground that, although the price of deregulated gas "could" in theory rise without limit, "the price of regulated gas 'could' be higher than the price of deregulated gas." 813 F. 2d, at 1068. The court reasoned that "[s]uch an understanding of 'could'—one that considers only the theoretical possibilities—renders § 101(b)(5) meaningless." *Ibid.* Rather, the court concluded: "'Could' makes sense in § 101(b)(5) only in the context of how gas sales actually occur." *Ibid.* Under this reading of § 101(b)(5), the statute requires a determination of which provision would actually result in a higher price under current market prices for that gas and the contractual arrangement each producer had for the sale of that gas. *Ibid.* The provision that actually results in the highest price at any particular moment establishes the applicable category for that producer's gas.

We disagree with the Court of Appeals' conclusion that reading the word "could" in § 101(b)(5) with its ordinary conditional meaning makes so little sense that the word "could"

must be converted to the word "will." The conditional meaning of "could" makes perfect sense if the statute does not mean to refer to particular contracts but rather to the generic situation of parties in a precontract state: the provision that allows the parties to contract to the highest conceivable price applies. Congress must have had in mind the fact that prior to entering into a contract the parties could always contract to a higher price—*i. e.*, a higher price could result—without a price ceiling than with one. After all, no party has any reason to contract to a higher price simply because a price ceiling has been imposed; the price ceiling can only impose a direct legal restraint if the market price would be above the price ceiling. Cf. § 101(b)(9), 15 U. S. C. § 3311(b)(9) (declaring contract prices enforceable if they do not exceed an applicable price ceiling or if a deregulatory provision applies). The Court of Appeals' difficulty with the statutory language is caused by its focus on the postcontract situation, where many of the contracts contain clauses that have the perverse effect of increasing the price when a price ceiling is imposed. We doubt seriously that Congress enacted § 101(b)(5) with such contracts in mind or that it would have wished to make sure that the Act interacted with such contracts to mandate the maximum price possible. Certainly nothing in the legislative history suggests Congress had such a system in mind.

Indeed, the Court of Appeals' reading is contrary to the whole thrust of the Act, for it has the effect of turning a statutory scheme of price ceilings and deregulation into a system of price supports for producers. There is no evidence that Congress had any intent to create such a producer-assistance program. The Act was a compromise: those supporting deregulation were opposed only by those who thought deregulation would allow producers to charge excessive prices. Not one participant in the legislative process suggested that producers should receive higher prices than deregulation would afford them. The operating assumption of Congress was

that deregulation was the most favorable regime for gas producers under consideration. See, *e. g.*, 124 Cong. Rec. 28633 (1978) (statement of Sen. Jackson) (describing deregulation as "the maximum economic incentive").

We are moreover reluctant to read § 101(b)(5) as making the applicable provision for a particular type of gas vary not only from producer to producer and from contract to contract, but from day to day as the actual market price of that gas changes. The statute is phrased in a general way that implies that all gas fitting the same overlapping provisions will be treated the same, and one would normally expect that a regulatory regime would apply uniformly rather than varying in such a chaotic fashion. The statute calls for a comparison of statutory provisions, not contractual ones, and nothing in the statute or legislative history suggests that Congress wanted the classification of gas to turn on contractual terms. Indeed, if the logic of the Court of Appeals' position were pursued, then, even for gas that fell into two regulated categories, § 101(b)(5) would require a comparison of each producer's contract prices for each category rather than a comparison of the ceiling prices for each category. We see no reason for inferring that Congress intended such a regulatory regime or the disuniformity and administrative difficulties it would entail.

### III

We also disagree with the Court of Appeals' decision to overturn FERC's ruling that certain gas qualified as "new tight formation" gas under § 107(c)(5), 15 U. S. C. § 3317(c)(5), is automatically also qualified as deregulated "new" gas under § 102(c) or § 103, 15 U. S. C. §§ 3312(c), 3313. Section 107(c)(5) gives FERC authority to make eligible for special high-cost gas pricing natural gas "produced under such . . . conditions as [FERC] determines to present extraordinary risks or costs." Pursuant to § 107(c)(5), FERC has defined "new tight formation gas" as gas

"(i) Which is new natural gas, (as defined in section 102(c)), certain OCS gas qualifying for the new natural gas ceiling price (as defined in section 102(d)), or gas produced through a new onshore production well (as defined in section 103(c); and

"(ii) Which is produced from a designated tight formation through a well the surface drilling of which began on or after July 16, 1979." 18 CFR § 271.703(b)(2) (1987).

In the proceeding below, which did not address certain Outer Continental Shelf gas under §102(d), 15 U. S. C. §3312(d), FERC has simply ruled that, because "[i]n order to qualify as new tight-formation gas under section 107(c)(5), a producer must file the same information, in addition to other information, that would be filed to qualify as a section 102 or 103 determination . . . , a determination that gas qualifies as new tight-formation gas is implicitly a determination that the gas meets the qualifications for either section 102(c) or 103 . . . , regardless of whether that was explicit at the time that the determination was made." 49 Fed. Reg. 46874, 46880 (1984).

We see nothing objectionable about this ruling, which merely recognizes that, as defined, the types of "new tight formation gas" that were under consideration by FERC are a subset of deregulated "new" gas under § 102(c) or § 103. The Court of Appeals' objections to the ruling were based on its conclusion that allowing one qualification to result automatically in a second qualification would interfere with what it inferred was Congress' intent to give producers the right to select the categories they desired. 813 F. 2d, at 1069. The court had two bases for inferring this intent. One was its reading of § 101(b)(5), which we reject above. The other was its reading of certain portions of the legislative history, which state that governmental agencies have no affirmative obligation to identify the applicable classification and that it is up to producers to apply for the designations they want. 813 F. 2d, at 1070 (quoting 124 Cong. Rec. 29109, 38363–38364

(1978)).   But the fact that Congress declined to impose affirmative investigative duties on agencies hardly means that it did not want FERC to adopt rules for classifying gas based on the evidence presented by producers at determination hearings.

The producer respondents also argue that FERC's rule intrudes on the jurisdiction other state and federal agencies have to make category determinations under § 503, 15 U. S. C. § 3413.   FERC, however, has made no category determinations.   It has merely promulgated a definitional rule applicable in determination proceedings.   This FERC has ample authority to do.   Not only does § 107(c)(5) give FERC broad authority to define the gas eligible for § 107(c)(5) treatment, but § 503 gives FERC authority to review the category determinations of other agencies and to prescribe the manner and substantiation with which such category determinations must be presented for its review.   And under § 501, 15 U. S. C. § 3411, FERC has general authority to define terms under the Act and to prescribe "such rules and orders as it may find necessary or appropriate to carry out its functions."

For the foregoing reasons, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE WHITE took no part in the consideration or decision of these cases.