872 F.2d 438
 277 U.S.App.D.C. 3
 WILLIAMS NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Southern California Gas Company, Texaco Inc., ARCO Oil and
Gas Co., Pacific Gas and Electric Co., Enserch
Exploration, Inc., Exxon Corporation,
Texas Eastern Transmission
Corp., Intervenors.
TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
ARCO Oil and Gas Co., Enserch Exploration, Inc., Williams
Natural Gas Company, Intervenors.
TEXAS GAS TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Enserch Exploration, Inc., ARCO Oil and Gas Co., Williams
Natural Gas Company, Intervenors.
 Nos. 88-1079, 88-1251 and 88-1264.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 3, 1989.
Decided April 7, 1989.
 
 Michael E. Small, Washington, D.C., with whom John H. Cary, William Douglas Field, Jr., Owensboro, Ky., and Judy M. Johnson, Houston, Tex., were on the brief, for petitioners in No. 88-1079, et al.
 Dale A. Wright and James T. McManus, Washington, D.C., also entered appearances for petitioner in No. 88-1079.
 John S. Carr also entered an appearance for petitioner in No. 88-1251 and for intervenor Texas Eastern Transmission Corp. in No. 88-1079.
 Robert W. Perdue, Washington, D.C., also entered an appearance for petitioner in No. 88-1264.
 Samuel Soopper, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel, F.E.R.C., and Jerome M. Feit, Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent in No. 88-1079, et al.
 John Conway also entered an appearance for respondent in Nos. 88-1079, 88-1251 and 88-1264.
 Carroll L. Gilliam, Kevin M. Sweeney, Catherine E. Bocskor, Washington, D.C., Jack M. Wilhelm, New Orleans, La., Harris S. Wood, Kathleen E. Magruder, Ralph J. Pearson, Jr. and John P. Beall, Houston, Tex., were on the joint brief of intervenors Amoco Production Co., Arco Oil and Gas Co., Div. of Atlantic Richfield Co., Enserch Exploration Inc., as Managing General Partner of EP Operating Co. and Texaco Inc., in support of respondent in No. 88-1079, et al.
 E.R. Island and David L. Huard, Los Angeles, Cal., entered appearances for intervenor Southern California Gas Co. in No. 88-1079.
 Charles F. Hosmer, Jr., Dallas, Tex., also entered an appearance for intervenor ARCO Oil and Gas Co. in Nos. 88-1079, 88-1251 and 88-1264.
 J. Paul Douglas, Washington, D.C., also entered an appearance for intervenor ARCO Oil and Gas Co. in No. 88-1079.
 Joshua Bar-Lev, Steven F. Greenwald and Lindsey How-Downing, San Francisco, Cal., entered appearances for Pacific Gas and Elec. Co. in No. 88-1079.
 George C. Garikes, Washington, D.C., also entered an appearance for intervenor Enserch Exploration Inc. in Nos. 88-1079, 88-1251 and 88-1264.
 C. Roger Hoffman and Douglas W. Rasch, Houston, Tex., entered appearances for intervenor Exxon Corp. in No. 88-1079.
 Judy M. Johnson, Houston, Tex., also entered an appearance for intervenor Texas Eastern Transmission Corp. in No. 88-1079.
 Dale A. Wright, Michael E. Small, Washington, D.C., and John H. Cary also entered appearances for intervenor Williams Natural Gas Co. in Nos. 88-1251, 88-1264.
 Maria M. Jackson, Washington, D.C., entered an appearance for intervenor Williams Natural Gas Co. in No. 88-1264.
 Before WALD, Chief Judge, and WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 Petitioners Williams Natural Gas Company, Texas Eastern Transmission Corporation, and Texas Gas Transmission Corporation (collectively "Williams") seek review of an order of the Federal Energy Regulatory Commission ("FERC" or "the Commission"). That order terminated an ongoing rulemaking; by terminating the docket, FERC maintained an incentive price for certain "tight formation" natural gas regulated under the Natural Gas Policy Act ("NGPA" or "the Act"). Williams contends that the Commission, by failing to complete the rulemaking, has acted arbitrarily and capriciously and in contravention of its statutory obligations. Because we conclude that the agency has failed to justify its termination of the rulemaking, we remand for further consideration by the Commission.
 
 I. FACTS
 A. The Natural Gas Policy Act
 
 2
 Enacted in 1978, the Natural Gas Policy Act, 15 U.S.C. Sec. 3301 et seq., "comprehensively and dramatically changed the method of pricing natural gas produced in the United States." Public Service Commission v. Mid-Louisiana Gas Co., 463 U.S. 319, 322, 103 S.Ct. 3024, 3027, 77 L.Ed.2d 668 (1983). The Act defines several categories of natural gas and sets ceiling prices for "first sales" in each category. Congress recognized, however, that the recovery of some gas reserves might not be economically feasible if producers were limited to the maximum prices established by the statute. The Act therefore provided that "[t]he Commission may, by rule or order, prescribe a maximum lawful price, applicable to any first sale of any high-cost natural gas, which exceeds the otherwise applicable maximum lawful price to the extent that such special price is necessary to provide reasonable incentives for the production of such high-cost natural gas." NGPA Sec. 107(b), 15 U.S.C. Sec. 3317(b). The Act specifically identified four sources from which gas produced would be deemed "high-cost natural gas." NGPA Sec. 107(c)(1)-(4), 15 U.S.C. Sec. 3317(c)(1)-(4). The statute further provided the Commission with the authority to prescribe incentive prices for any gas "produced under such other conditions as the Commission determines to present extraordinary risks or costs." NGPA Sec. 107(c)(5), 15 U.S.C. Sec. 3317(c)(5).
 
 
 3
 The ceiling prices established by the statute were not intended to remain in perpetuity. The Act itself provided that maximum prices for the different categories of gas would rise from month to month in compliance with a statutorily-determined formula. Moreover, the maximum prices were intended to be transitional only: most natural gas was deregulated as of January 1, 1985.
 
 
 4
 The NGPA was enacted against a backdrop of growing demand for natural gas and rising prices for energy generally. The Act was intended to ensure producers an adequate return on their investment, and thereby to ensure that sufficient supplies of natural gas would be available. But the Congress which passed the Act quite plainly supposed that the statutory ceiling prices would be lower than those which would obtain in an unregulated market.. See FERC v. Martin Exploration Management Co., 486 U.S. 204, 108 S.Ct. 1765, 1769, 100 L.Ed.2d 238 (1988) ("Not one participant in the legislative process suggested that producers should receive higher prices than deregulation would afford them"). That expectation, however, has proved to be inaccurate. Since the passage of the Act, market-clearing prices for natural gas have plummeted, due in large measure to a drop in prices for alternative fuels; by 1984 they were lower than the regulated price ceilings established by the statute. See Martin Exploration, 108 S.Ct. at 1768.
 
 
 5
 If agreements between producers and pipelines were renegotiated on a day-to-day basis, then the drop in natural gas prices would make the price ceilings irrelevant: the parties would presumably base their transactions on the current market-clearing rate, which is presently lower than the ceiling itself. A price ceiling, after all, can be expected to affect prices only if it is lower than the rate which would otherwise be charged. Contracts for the purchase of natural gas are not, however, frequently renegotiated to reflect changing market conditions. These agreements typically span very long periods of time, and the price is often contractually tied to the price ceiling established by the statute or regulations. Thus, the NGPA's program of price ceilings has become a de facto system of price supports, since many pipelines are obligated by contract to pay a "ceiling" price which is far in excess of the market rate. As the Supreme Court has noted:
 
 
 6
 [T]hese [long-term] contracts had one clause setting the price if the gas were regulated and another clause setting the price if it were deregulated. The contract price for regulated gas was typically close to the price ceiling; the contract price for deregulated gas was typically based on market prices or left open to renegotiation. Because by 1984 the market price of natural gas had plunged below the regulated price ceilings, these producers stood to reap higher contractual prices if their gas was regulated than if it were deregulated.
 
 
 7
 Martin Exploration, 108 S.Ct. at 1768.
 
 B. Order No. 99
 
 8
 As noted earlier, NGPA Sec. 107(c)(5) gives the Commission the power to prescribe an incentive price for high-cost natural gas which does not fit within the categories enumerated in Sec. 107(c)(1)-(4). On July 16, 1979, President Carter recommended the establishment of incentives for the production of "tight formation" natural gas.[1] After conducting a rulemaking, the Commission promulgated regulations establishing incentive prices for tight formation gas.
 
 
 9
 Order No. 99 both defined the gas to which the incentive price would apply and established the appropriate ceiling. Not all tight formation gas was made eligible for this special price. Rather, the incentive price is available only if the contract contains a "negotiated contract price," defined by the regulations as "any price established by a contract provision that specifically references the incentive pricing authority of the Commission under Section 107 of the NGPA, by a contract provision that prescribes a specific fixed rate, or by the operation of a fixed escalator clause." 18 C.F.R. Sec. 271.702(a)(1). A contract which simply referenced the NGPA without specifically mentioning Sec. 107 would not be sufficient to allow collection of the incentive price. The agency explained "that it must limit the availability of the incentive price ceiling to those contracts which specifically refer to it (or to the extent permitted under a fixed rate or fixed escalator clause) because its pricing authority is limited to setting incentive prices 'necessary' to encourage additional production." F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] at 31,272. Without this requirement, the Commission believed, the incentive price might simply provide a windfall to a producer that had plainly expressed its willingness to sell gas at a lower rate. The presence of a negotiated contract price, on the other hand, was regarded as conclusive evidence that the incentive price was in fact necessary to induce production. The Order did provide that "contracts which do not presently contain a negotiated contract price may be amended to permit collection of the incentive price." F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] at 31,271.
 
 
 10
 The Commission established this tight formation price pursuant to its authority to prescribe incentive prices for "high-cost" natural gas. In setting the appropriate ceiling, however, the agency did not look solely to the cost of production. Rather, FERC combined a "cost-related" with a "value-related" approach, see F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] at 31,266: the Commission looked both to costs of production and to the price of alternative fuels. The Commission apparently believed that consideration of alternative fuel prices was essential in light of the statutory requirement that incentive prices be "necessary to provide reasonable incentives for the production of such high-cost natural gas." NGPA Sec. 107(b), 15 U.S.C. Sec. 3317(b) (emphasis supplied).[2] The agency set the price ceiling for tight formation gas at 200 percent of the Sec. 103 price. See F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] at 31,270. Order No. 99 was the subject of a timely challenge and was upheld by the Fifth Circuit. See Pennzoil Co. v. FERC, 671 F.2d 119 (5th Cir.1982).
 
 C. The 1983 Notice of Proposed Rulemaking
 
 11
 On February 10, 1983, FERC issued a Notice of Proposed Rulemaking ("NOPR"), which advocated substantial changes in the incentive price for tight formation gas. See Limitation on Incentive Prices for High-Cost Gas to Commodity Values, Docket No. RM82-32-000, F.E.R.C. Stats. and Regs. [Proposed Regs. 1982-1987] p 32,294. The Commission noted that its experience under the NGPA had belied the premises on which the incentive price had originally rested:
 
 
 12
 In 1980, at the time the Commission sought to maximize incentives for the production of high-cost gas in Order Nos. 99 and 107, it did so against a backdrop of rising oil prices, a stronger economy and relatively little experience with the effects of the NGPA on gas supplies and pricing. In the two years since that period, oil prices have declined in real terms and the economy has stagnated, resulting in substantially decreased demand for gas and all other fuels. At the same time, gas prices have risen steadily, due both to the pricing mechanisms built into the NGPA and the contracting practices of pipelines and producers.
 
 
 13
 Id. at 32,497. The NOPR noted that "the Commission must now consider whether its own decisions in setting incentive ceilings under NGPA section 107(c)(5) are exacerbating the current gas pricing problems." Id. And the agency expressed the tentative conclusion that
 
 
 14
 a ceiling price in excess of the commodity value of gas, as measured by reference to the prices of competing fuels, is contrary to the public interest. Accordingly, the Commission is proposing to limit the incentive prices for high-cost gas already established by the Commission to ... an imputed commodity value based on the price of alternative fuels.
 
 
 15
 Id. at 32,497-32,498. The NOPR indicated that any regulatory change could apply to all new tight formation gas "the surface drilling of which commenced after the date of publication of this Notice in the Federal Register." Id. at 32,499-32,500. The date of publication in the Federal Register was February 22, 1983, see 48 Fed.Reg. 7,469. The NOPR also stated that "the Commission is specifically considering expanding the applicability to include future maximum lawful prices for all tight formation" gas, including gas from wells the drilling of which had already commenced. F.E.R.C. Stats. and Regs. [Proposed Regs. 1982-1987] at 32,500.
 
 
 16
 The agency received numerous comments on its proposal. Pipelines favored a reduction in the ceiling, stressing that natural gas prices had become exorbitant in relation to prices of alternative fuels. Producers opposed the change, asserting that the reasoning of Order No. 99 remained sound and that the proposed reduction would not allow adequate incentives for continued development. The Commission, however, took no action, even after receiving repeated petitions to expedite the rulemaking. Finally, almost four years later, FERC terminated the docket. See Basket Termination Order, Order No. 459 (December 5, 1986), Joint Appendix ("J.A.") 1.[3] Texas Gas Transmission Corporation and Williams Natural Gas Company petitioned for rehearing; those petitions were denied. See Basket Termination Order; Order Denying Rehearing, Order No. 459-A (February 3, 1988), J.A. 214. Williams, Texas Gas, and Texas Eastern Transmission Corporation then sought review in this court. The petitioners argued that FERC's termination of the rulemaking was arbitrary and capricious, and that retention of the current incentive price for tight formation gas was in contravention of the statute. The petitioners asked the court "to reverse or, alternatively, to remand the FERC's orders with instructions to eliminate or to modify ... incentive pricing for all tight formation gas as of January 1, 1985." Brief for Petitioners at 37.
 
 II. ANALYSIS
 A. Standard of Review
 
 17
 The law in this circuit clearly holds that an agency's termination of an ongoing rulemaking is judicially reviewable. As we said in Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1047 (D.C.Cir.1979) ("NRDC"), "in light of the strong presumption of reviewability, discretionary decisions not to adopt rules are reviewable where, as here, the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested but not adopted." See also Environmental Defense Fund v. EPA, 852 F.2d 1316 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989); Action on Smoking and Health v. C.A.B., 699 F.2d 1209 (D.C.Cir.1983). The NRDC court drew a clear distinction between an agency's refusal to undertake a rulemaking (reviewable, if at all, under an exceedingly narrow standard), and its decision to terminate a docket after a substantial record has been compiled. See NRDC, 606 F.2d at 1045-47.[4] In the present case, it is clear that we are confronted with no mere failure to act. The agency has issued a lengthy document expressing its tentative conclusion that a change in the regulations is warranted, and it has received numerous comments on the issue from interested parties. Under these circumstances, a court generally will have a sufficient evidentiary basis for determining whether the Commission's ultimate decision was arbitrary and capricious or in contravention of the statute.
 
 
 18
 At the same time, however, we believe that the agency's termination of a rulemaking should be reviewed somewhat more deferentially than would its promulgation of a new rule. When the agency promulgates a new regulation, or when it rescinds an old one, it alters the regulatory status quo. Such a decision, we believe, requires a more persuasive justification than does the decision to retain an existing rule. As the Supreme Court stated in a slightly different context:[5]
 
 
 19
 If Congress established a presumption from which judicial review should start, that presumption ... is not against ... regulation, but against changes in current policy that are not justified by the rulemaking record.
 
 
 20
 Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (emphasis in original). We do not believe that it is necessary to articulate a distinct intermediate standard for reviewing an agency's termination of an ongoing docket. We simply note that our application of the "arbitrary and capricious" standard must be informed by our recognition that an agency's decision to retain the status quo may be more easily defensible than a shift in policy would be.
 
 
 21
 B. What Gas is Affected?
 
 
 22
 The Supreme Court's recent decision in Martin Exploration upheld FERC's determination that new tight formation gas which qualifies for deregulation under NGPA Sec. 102(c) or Sec. 103 would be deregulated on January 1, 1985. See 108 S.Ct. at 1770-71. It appears that most tight formation gas is therefore no longer subject to the price ceilings established by the NGPA. Some tight formation gas, however, remains regulated. As the agency's brief to this court states:
 
 
 23
 "New tight formation gas" qualifying under Section 103(b)(2) which was committed or dedicated to interstate commerce on April 20, 1977, and which would not otherwise qualify for deregulation under Section 102, could remain regulated. Otherwise, only "recompletion tight formation gas," which is not required to also qualify under NGPA Sections 102 and 103, remains subject to a regulated ceiling. Only a small percentage of gas remains price regulated.
 
 
 24
 Brief for FERC at 16 n. 10. Plainly, the price of regulated tight formation gas will be affected by the retention of the incentive ceiling. The impact of FERC's decision to terminate the docket, however, extends beyond this category of gas.
 
 
 25
 The Notice of Proposed Rulemaking indicated that any eventual reduction in the ceiling price for tight formation gas could apply to all such gas "the surface drilling of which commenced after the date of publication of this Notice in the Federal Register." F.E.R.C. Stats. and Regs. [Proposed Regs. 1982-1987] p 32,294 at 32,499-32,500. If the agency had promulgated the rule as it was set forth in the NOPR, the retroactive application of that rule would have resulted in substantial refunds to the pipelines. Of course, we recognize that the agency might have reduced the ceiling price for tight formation gas without giving its decision retroactive effect. There is also some uncertainty as to the extent of the Commission's authority to order retroactive changes in light of the filed-rate doctrine. See Midwest Gas Users Association v. FERC, 833 F.2d 341 (D.C.Cir.1987). Thus, if the rulemaking had not been terminated, and if the Commission had chosen to reduce the incentive price, that decision would not necessarily have resulted in refunds to the pipelines. It nevertheless seems clear to us that this additional category of gas--tight formation gas already bought and paid for which was produced from wells drilled after February 22, 1983--was at least potentially affected by FERC's termination of the docket.
 
 
 26
 Moreover, the retention of the incentive price can be expected to exert a continuing impact on at least some future sales of deregulated tight formation gas. It appears that many long-term contracts between pipelines and producers provide that the price for deregulated gas will be set by reference to the "last regulated price." Thus, the retention of the incentive price, through the operation of these contractual clauses, will continue to affect the price of gas sold after the date of deregulation.[6]C. Williams' Challenges to the Commission's Decision
 
 
 27
 Williams asserts two broad challenges to the Commission's decision to retain the incentive price for tight formation gas. Both of the petitioners' arguments rest on the statutory requirement that incentive prices be established only when they are "necessary to provide reasonable incentives for the production of such high-cost natural gas." NGPA Sec. 107(c)(5), 15 U.S.C. Sec. 3317(c)(5). In issuing Order No. 99, in 1980, FERC concluded that higher ceiling prices for tight formation gas met the statutory criteria. The petitioners acknowledge that the incentive price was "necessary" and "reasonable" in 1980. They contend, however, that FERC's initial finding can no longer be presumed correct.
 
 
 28
 The petitioners' first argument is based on language in Order No. 99 itself. In petitioners' view, Order No. 99 found only that the new incentive price would be necessary and reasonable until January 1, 1985; it made no finding as to whether the tight formation ceiling would be warranted after that time.[7] Therefore, in Williams' view, the incentive price could be maintained after that date only pursuant to a new Commission finding. Since FERC plainly failed to make such a finding before it terminated the docket, Williams argues, the retention of the incentive price after January 1, 1985, was arbitrary and capricious and in violation of the statute.
 
 
 29
 We do not believe that Order No. 99 supports the petitioners' position. That Order, it is true, contained passing references to the effect that "the focus of our pricing inquiry is to determine the necessary incentive for the transition period between now and 1985. It is our intention to establish a price that will stimulate production of gas from tight formations during the transition period." F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] at 31,266. It is on statements such as these that Williams relies. Read in context, however, these statements simply reflect the agency's view that the price ceilings would be largely irrelevant after January 1, 1985, because most tight formation gas would be deregulated after that date. Order No. 99 did not, in our view, suggest that the incentive price would abruptly cease to be reasonable as to those categories of tight formation gas which remained subject to regulation.
 
 
 30
 Nor, in our opinion, is there any real logical force to Williams' argument. As to most natural gas--including most tight formation gas--Congress plainly intended that January 1, 1985, would be a watershed date. It seems equally plain, however, that for certain categories of gas this date was not to be pivotal. We see no connection between the deregulation of most gas and the appropriate ceiling for that portion of gas which remains regulated. We therefore reject the petitioners' contention that FERC's maintenance of the incentive price after January 1, 1985, required a new finding that such a price remained necessary and reasonable.
 
 
 31
 Williams' second argument, however, is more compelling. As we have noted, this is not a case in which the agency has simply ignored private parties' requests for rulemaking. Rather, the agency itself has called into question the propriety of its own regulation. Cf. Meredith Corp. v. FCC, 809 F.2d 863, 873 (D.C.Cir.1987) (the ordinary presumption that a validly promulgated regulation remains valid is not applicable where "the Commission itself has already largely undermined the legitimacy of its own rule"). The NOPR stated that
 
 
 32
 the Commission must now consider whether its own decisions in setting incentive ceilings under NGPA section 107(c)(5) are exacerbating the current gas pricing problems. The Commission believes that a ceiling price in excess of the commodity value of gas, as measured by reference to the prices of competing fuels, is contrary to the public interest.
 
 
 33
 F.E.R.C. Stats. and Regs. [Proposed Regs. 1982-1987] at 32,497. The agency did not expressly question the legality of the incentive price for tight formation gas. It would seem to us quite difficult, however, to reconcile the NOPR's view of current market conditions with the statutory requirement that an incentive price be "necessary to provide reasonable incentives" for production. We therefore view the NOPR as expressing the agency's tentative conclusion that the incentive price for tight formation gas would disserve the public interest and would violate the governing statute.
 
 
 34
 Of course, the agency's articulation of this belief did not obligate it to alter the incentive price for tight formation gas. An NOPR is by definition the expression of an agency's tentative position. The whole point of notice-and-comment rulemaking, after all, is that the comments which the agency receives may induce it to abandon or modify its initial views. We therefore recognize that the issuance of an NOPR--even a strongly worded NOPR--in no way binds the Commission to promulgate the proposed regulation. We do believe, however, that the agency, having expressed these tentative views and having solicited comments on the issue, was not free to terminate the rulemaking for no reason whatsoever. In deciding whether the termination of this docket was arbitrary and capricious, we must therefore examine the Commission's stated reasons for its decision.
 
 
 35
 D. FERC's Justifications for Terminating the Docket
 
 
 36
 In denying rehearing of its order terminating this docket, the agency stated:
 
 
 37
 The Commission is denying rehearing of the termination of the incentive prices rulemaking dockets because the actions proposed in these dockets, as well as the information and comments submitted in these dockets, fail to reflect the substantial changes that have occurred in the natural gas industry since these proposals were initiated. These changes make the terminated proposals unnecessary in light of the current competitive market for natural gas.
 
 
 38
 Order No. 459-A at 3, J.A. 217. Though the Commission advances several discrete arguments to support its termination of the rulemaking, all are variants of the same basic theme: that changes in the industry have rendered the NOPR proposals obsolete. Our attention is drawn, we note at the outset, to one change which FERC does not contend has occurred. The Commission does not deny that the incentive price for tight formation gas remains substantially higher than the market-clearing rate. It does not, in short, assert that the regulatory anomaly which originally prompted the NOPR no longer exists. Examining the agency's arguments based on changed conditions, we conclude that none is sufficient to justify its termination of the rulemaking.
 
 1. Deregulation of Natural Gas
 
 39
 One of the agency's arguments is that any problem posed by the incentive prices has been largely rendered moot, since most tight formation gas is now deregulated and thus is no longer governed by the ceilings set by the Commission. Order No. 459-A, issued before the Supreme Court's decision in Martin Exploration, stated that "[i]f the Supreme Court [upholds FERC's position], a large portion of high-cost gas under section 107(c)(5) would be deregulated and would no longer be subject to the NGPA section 107 maximum lawful price ceiling." Order No. 459-A at 10 n. 10, J.A. 224. FERC's brief to this court states that
 
 
 40
 there should be few cases where gas that is qualified under Section 107(c)(5) has not been qualified for a deregulated status for which it is eligible.... [I]mplementation of NGPA deregulation ... has by and large done away with Section 107(c)(5) pricing, thus rendering [Williams'] argument moot in a practical sense.
 
 
 41
 Brief for FERC at 17. We believe that this argument fails in two respects.
 
 
 42
 First, the agency's position here rests on the erroneous premise that retention of the incentive price will have a practical effect only on future sales of regulated gas. The Commission ignores the fact that the NOPR envisioned possible retroactive application of any eventual regulatory change--a proposal which, if carried out, would result in substantial refunds to the pipelines. The Commission also ignores the contention that many contracts for future sales of deregulated gas have set the price by reference to the last regulated price. We therefore believe that FERC has seriously underestimated the extent to which its termination of the docket exerts a continuing impact on pipelines and producers.
 
 
 43
 Moreover, we would find FERC's argument unavailing even if we accepted its premise that only future sales of regulated gas will be affected by retention of the incentive price. The NOPR expressed the tentative conclusion that the incentive price established by Order No. 99 was no longer reasonable in comparison to the costs of alternative fuels--a conclusion which the agency has never disavowed. Given the statutory requirement that Sec. 107 ceilings should provide "reasonable incentives" for production, this would seem tantamount to saying that the tight formation price was no longer authorized by the statute. In response to the NOPR, numerous parties filed comments arguing that the incentive price had become unlawful. The Commission has simply refused to address this question. Perhaps the agency may refuse to rectify a statutory violation whose practical import is de minimis, but its authority to do so must surely be narrowly circumscribed. In our view, the agency's statement that a "large portion" of tight formation gas has been deregulated is plainly insufficient to justify the agency's failure to act.
 
 2. Reliance on Competition
 
 44
 The Commission's second argument, closely related to the first, is that competitive pressures in a largely deregulated market will alleviate any problems caused by long-term contracts which reference the incentive price. Order No. 459-A states that
 
 
 45
 [t]he Commission expects that parties to a contract would renegotiate a "problem contract" if the contract term is no longer market-responsive. The Commission, therefore, expects that the current market will serve to limit incentive prices to competitive levels. Such competitive market forces should be given a chance to operate before any decision is made that regulatory measures are needed to limit incentive prices.
 
 
 46
 Order No. 459-A at 9-10, J.A. 223-24.
 
 
 47
 The agency does not explain why producers would agree to renegotiate long-term contracts which obligate the pipelines to pay an incentive price which is far in excess of market rates. In our view, this reliance on competition is subject to the same criticisms which led to the invalidation of FERC's decisions in Associated Gas Distributors v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), and Consolidated Edison of New York, Inc. v. FERC, 823 F.2d 630 (D.C.Cir.1987). Reliance on competition in this setting "reflects a pervasive frame of mind of the Commission about a crucial problem in the natural gas industry, ... a refusal to face the fact that the burdensome take-or-pay contracts will not go away...." Consolidated Edison, 823 F.2d at 641-42. The agency "seems to confuse the pipelines' incentives to renegotiate contracts with their ability to do so." Associated Gas, 824 F.2d at 1024 (emphasis in original). We therefore do not believe that the agency's termination of the docket can be sustained on this basis.
 
 3. Consensual Nature of the Incentive Price
 
 48
 The Commission also emphasizes that its tight formation rules (like the NGPA generally) establish ceiling prices, not mandated rates. Since actual prices are set by contract between the parties, Order No. 459-A states, "[t]he Commission expects the parties to negotiate an appropriate price for the purchase and sale of high-cost gas in the market." Order No. 459-A at 9, J.A. 223. The agency's brief gives this argument a slightly accusatory twist, asserting that
 
 
 49
 Williams is complaining about the effect of contracts it freely negotiated, which failed to take into account the inevitable effect of deregulation.... What Williams chooses to ignore, however, is that in those cases in which it is subject to the Section 107(c)(5) price, this is so by means of already negotiated contracts under which it has agreed that an incentive price for the particular production was necessary to bring the gas to the market, and thus to pay a price up to the Section 107(c)(5) ceiling.
 
 
 50
 Brief for FERC at 18-19 (emphasis in original). We do not believe, however, that FERC can evade its responsibilities by arguing that the petitioners have brought their troubles on themselves.
 
 
 51
 Order No. 99, it is true, did presume that a contractual provision referencing the incentive price constitutes evidence that this price is "necessary" to bring the gas to the market. Plainly, though, the Commission did not presume that any price on which contracting parties agree can be deemed "necessary to provide reasonable incentives" for production. Had the Commission acted on that presumption, it would have imposed no ceiling at all on tight formation gas; in other words, it would have deregulated this gas by rule prior to the statutory deregulation date. The agency has never suggested that the NGPA gives it the power to take such a step. Rather, Order No. 99 required both that the incentive price be necessary to induce production (as evidenced by the parties' contractual agreement) and that it provide a reasonable incentive (as measured by prices for alternative fuels). The fact that petitioners have entered into contracts referencing the incentive price does not prove that this price meets the statutory criteria.
 
 
 52
 In fact, the premise on which FERC's argument depends--the assumption that any price upon which buyer and seller agree is, ipso facto, a reasonable price--is wholly alien to the statutory framework. The NGPA did provide for deregulation of most natural gas on January 1, 1985. But it also mandated price ceilings for gas sold prior to that date (and for some gas sold later). The Act can hardly be seen as reflecting unequivocal enthusiasm for market forces as price-setting mechanisms. FERC's argument, we would note, would appear to preclude any party from ever challenging a price ceiling set by the agency on the ground that it has been set too high, since the ceiling price will always be collected pursuant to a contractual agreement. We see no basis in either the statute or in logic for such an extraordinary abdication of the agency's role.
 
 
 53
 Finally, we believe it is significant that FERC has not merely tolerated, but has actively encouraged, the formation of contracts between producers and pipelines which incorporate by reference the regulatory ceiling. Order No. 99 provided that the incentive price for tight formation gas could be collected only if the parties had agreed upon a "negotiated contract price." One means of satisfying this requirement was to set the contractual price by reference to the Sec. 107 ceiling. FERC further provided that contracts which did not contain such a term could be amended so as to allow collection of the incentive price. Having set the rate by reference to the incentive price, and having done so with the agency's encouragement, the pipelines were surely entitled to assume that the Commission would continue to monitor the ceiling price to ensure that it remained reasonable in light of subsequent developments. And, having cast substantial doubt upon its own rule, the Commission may not shirk its duty to complete the inquiry by arguing that the pipelines have brought their troubles on themselves.
 
 4. Staleness of the Record
 
 54
 The Commission also justified its termination of the rulemaking by arguing that "[t]he six dockets that relate to high-cost gas are all at least two years old and the proposals in those dockets may be no longer relevant to current conditions in the natural gas market." No. 459 at 10, J.A. 11. The agency does not contend that there is any particular reason to doubt that the incentive price for tight formation gas remains far higher than the market rate. It simply argues that, due to the staleness of the record, there is no way of knowing whether the concerns that originally prompted the NOPR remain present today.
 
 
 55
 The NOPR was issued on February 10, 1983 (and published in the Federal Register on February 22, 1983), and the rulemaking was terminated almost four years later. The agency waited an additional year before denying rehearing of the order that terminated the docket. These delays occurred despite repeated requests to expedite the rulemaking; FERC now contends that the long delay is itself a reason for abandoning the inquiry. We do not believe that the agency's decision can be upheld on this basis. If FERC regarded the information in its record as out-of-date, then it might more reasonably have chosen to supplement the record rather than terminate the docket. See Request of Texas Eastern Transmission Corporation for Rehearing of Order No. 459 at 20, J.A. 202.
 
 5. Parallel Proceedings
 
 56
 Finally, FERC argues that the termination of this docket was justified because the underlying problem has been adequately addressed in other rulemakings. The Commission relies particularly on its recently issued Order Nos. 451 and 500, Orders dealing with the larger problem of long-term take-or-pay contracts in the natural gas industry.[8] The agency is surely correct in noting that the incentive price creates continuing problems only because of its incorporation in long-term contractual agreements between pipelines and producers. There is consequently some logic to the Commission's belief that a comprehensive solution to the take-or-pay problem would be preferable to a piecemeal attack on its various manifestations. We do not believe, however, that either of these Orders undoes the effects of the incentive price.
 
 
 57
 First, the Orders in question are directed at problems which are only indirectly related to the problems created by the high incentive price for tight formation gas. Order No. 451 deals with "mixed-vintage" contracts--contracts for the sale of both "old" and "new" gas. The Commission has given us no reason to believe that a substantial percentage of tight formation gas sales are effected through mixed-vintage contracts. Order No. 500 allows pipelines to share with their downstream customers some of the costs of renegotiating take-or-pay agreements. It does nothing about the contracts themselves, and is thus of limited relevance to a dispute between pipelines and producers.[9] These Orders may provide effective responses to particular aspects of the take-or-pay problem, but neither appears to offer anything approaching a comprehensive solution.
 
 
 58
 Certainly neither of these Orders renders the incentive price irrelevant. These Orders, we emphasize, do not abrogate existing contracts; they simply provide incentives for the parties to renegotiate uneconomical agreements. It is clear, though, that when producers and pipelines renegotiate contracts for tight formation gas, the fact that these contracts reference the current high incentive price will give the producers additional leverage, allowing them to extract concessions that would otherwise be unavailable. To put it another way: these Orders may enable pipelines to buy their way out of uneconomical contracts, but the existence of the high incentive price will force them to pay more for the privilege.
 
 
 59
 Of course, there is nothing wrong with forcing the pipelines to bear most of the costs of their own bad bargains, if the contracts have become unfavorable due to the pipelines' improvidence or due to simple bad luck. But it is quite another matter if the contracts are unfavorable because they incorporate an incentive price which is no longer consonant with the statute. The NOPR appeared to reflect the Commission's tentative view that the incentive price for tight formation gas was no longer reasonable, and that its continued implementation would thus be contrary to the NGPA. It may be that the agency no longer holds that view. But the Commission should not be claiming that the issue is no longer of any consequence simply because the pipelines, by renegotiating their long-term contracts, may be able to avoid some of the costs which the incentive price would otherwise impose.
 
 
 60
 Nor can we sustain the termination of this docket on the basis of the agency's statement that this problem may be dealt with in a future proceeding.[10] If the Commission's action is not otherwise sustainable, it cannot be upheld on the basis of a suggestion that the issue might be addressed at some indeterminate point in the future. It is by no means clear, moreover, that the initiation of a new rulemaking would be equivalent to the reopening of the old docket. The 1983 NOPR indicated that any changes eventually made could be applied retroactively. Changes implemented by a new rulemaking might provide far less substantial relief. We do not suggest that the agency is obligated to apply regulatory changes retroactively, and indeed there may be legal constraints on its ability to do so. See Midwest Gas Users, supra p. 444. The Commission may not, however, simply ignore this issue in reaching its determination that a new rule-making will provide an adequate substitute for the old docket.
 
 III. CONCLUSION
 
 61
 We recognize that an agency's discretion is surely at its height when it chooses not to act. We also recognize that notice-and-comment rulemaking procedures contemplate--indeed presume--that the arguments of interested parties may induce an agency to rethink its initial view of a situation. The original NOPR in no way bound the agency to promulgate a final rule if further reflection, or changed circumstances, convinced the Commission that no regulatory change was warranted. Issuance of the NOPR did, however, oblige the agency to consider the comments it received and to articulate a reasoned explanation for its decision. We do not believe that the Commission has met these requirements.
 
 
 62
 Because we conclude that the Commission has failed to provide a satisfactory explanation for its termination of this docket, we remand to the agency for further consideration of this question. We do not order the agency to implement the proposal that was articulated in the NOPR. The Commission is required to reopen this docket, but it retains wide discretion on remand. The agency might, for instance, wish to solicit new comments in order to obtain updated information. FERC may also choose to terminate the docket again and to address this problem within the context of another proceeding, provided that it offers a reasoned explanation for its decision. The mere suggestion that FERC might consider this question at some point in the future will not, however, be sufficient. If the Commission decides to address this issue by way of a new rulemaking, it should explain why it believes, in light of the NOPR's provision for retroactive application, that a new proceeding will adequately protect the petitioners' interests.[11]
 
 
 63
 Judgment accordingly.
 
 
 
 [1]
 "A 'tight formation' is a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock. Because such a formation is characterized by low permeability, wells drilled into gas-bearing formations of this kind usually produce at very low rates. To stimulate production from these formations, producers must use expensive enhanced recovery techniques." Order No. 99, "Regulations Covering High-Cost Natural Gas Produced From Tight Formations," 45 Fed.Reg. 56,034 (April 22, 1980), F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] p 30,183 at 31,260
 
 
 [2]
 The agency stated that "[i]n establishing prices for high-cost gas, the Commission must be sensitive not to undermine Congress' overall pricing scheme. Section 107(c)(5) prices must not create perverse incentives but must be in harmony with the overall Congressional scheme." F.E.R.C. Stats. and Regs. [Reg. Preambles 1977-1981] at 31,265
 
 
 [3]
 This Order terminated several dockets dealing with related subjects. Only the termination of Docket No. RM82-32-000 is at issue in this proceeding
 
 
 [4]
 The court stated that "in general, the more complete an agency's consideration of an issue, the more likely it is that the ultimate decision not to take action will be a proper subject of judicial review." 606 F.2d at 1047 n. 19
 
 
 [5]
 In State Farm, the Supreme Court rejected the claim that rescission of an old regulation should be reviewed more deferentially than the promulgation of a new rule
 
 
 [6]
 Commenters informed the agency that these additional categories of gas would be affected by the termination of the docket. See, e.g., Request of Texas Eastern Transmission Corporation for Rehearing of Order No. 459 at 17, J.A. 199; Second Motion to Expedite of Northwest Central Pipeline Corporation at 8, J.A. 146
 
 
 [7]
 The petitioners concede that the 1980 regulations contain no "sunset" provision. That is, the rules did not, by their own terms, cease to apply as of January 1, 1985. Petitioners' argument is based solely on statements in the agency's preamble to those regulations
 
 
 [8]
 In its original decision to terminate the docket, FERC placed substantial reliance on Order No. 436. This court has since held, however, that Order No. 436 is flawed in that it may tend to exacerbate some of the problems created by long-term take-or-pay contracts. See Associated Gas, supra, 824 F.2d at 1024. On remand, the Commission issued Order No. 500
 
 
 [9]
 Our recent opinion in Tennessee Gas Pipeline Company v. FERC, 871 F.2d 1099 (D.C.Cir. 1989) provides an instructive contrast. In Tennessee Gas we upheld the Commission's decision to eliminate the "minimum commodity bill" which the pipeline had charged its customers. We relied heavily on FERC's assurance that Order No. 500 had addressed the precise problem with which the minimum bill was designed to deal. See Tennessee Gas at 1106-1107
 
 
 [10]
 In Order No. 500, the Commission solicited comments on whether "action under NGA section 5, or any other action (such as rescinding the incentive ceiling price for tight formation gas established under NGPA section 107(c)(5)), would contribute to solving pipeline take-or-pay problems." III F.E.R.C. p 30,761 at 30,784 (August 7, 1987). Commissioners Sousa and Stalon, concurring in Order No. 459-A, emphasized that they "support addressing certain of the issues raised in these dockets in the final rule implementing Order No. 500 or in a separate action under section 5 of the Natural Gas Act (NGA)." J.A. 226
 
 
 [11]
 The Commission may now believe that retroactive application of any change in the incentive ceiling is undesirable (or impermissible). Or the agency might conclude that it has the power to institute a new proceeding with an effective date of February 22, 1983. What the Commission may not do is ignore the issue entirely: it may not pretend that a change in the incentive price with an effective date in 1989 is equivalent to a change in the ceiling with an effective date of February 22, 1983
 The NOPR stated tentatively that any regulatory changes would apply retroactively to all tight formation sales from wells drilled after February 22, 1983. In its brief to this court, however, Williams requested that we eliminate "incentive pricing for all tight formation gas as of January 1, 1985." Brief for Petitioners at 37. We leave it to the Commission to determine, in the first instance, whether the petitioners have thereby waived their claim for refunds for gas purchased prior to January 1, 1985.