LONE STAR GAS COMPANY, et al., Appellants,

v.

The RAILROAD COMMISSION OF TEXAS, et al., Appellees.

No. 3–88–012–CV.

Court of Appeals of Texas, Austin.

Nov. 14, 1990.

David C. Duggins, Clark, Thomas, Winters & Newton, Austin, for appellants.

Jim Mattox, Atty. Gen., John A. Crane, Sarah F. Miller, Asst. Attys. Gen., Austin, for appellees.

Before SHANNON, C.J., and GAMMAGE and ABOUSSIE, JJ.

ABOUSSIE, Justice.

The opinion handed down by this Court on December 13, 1989, is withdrawn, and the following is substituted therefor.

Appellants filed suit in the district court of Travis County pursuant to the Declaratory Judgments Act, Tex.Civ.Prac. & Rem. Code Ann. §§ 37.001–37.011 (1986 & Supp. 1990) and the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. Ann. art. 6252–13a, § 12 (Supp.1990) (APTRA), seeking a declaration as to the validity and applicability of certain rules promulgated by the Texas Railroad Commission. After a trial on the merits, the district court rendered judgment that the Commission did not exceed its authority by enacting the rules, but dismissed the cause for lack of ripeness.

The trial court was called upon to declare (1) whether the rules in question were valid and (2) their applicability to certain described fact situations. By its judgment, the trial court purported to find that the rules were valid, but then proceeded to order a dismissal as to the entire cause on the basis that the request for declaratory relief applying the rules was premature. The two issues, although they might have been, were not severed; instead, the matter was before us for review on a judgment of dismissal. As our Supreme Court has noted many times, "[i]t is elementary that a dismissal is in no way an adjudication of the rights of parties; it merely places the parties in the position that they were in before the court's jurisdiction was invoked just as if suit had never been brought." *Crofts v. Eighth Court of Civil Appeals,* 362 S.W.2d 101, 104 (Tex.1962).

In an unpublished opinion, we held that the court erred in dismissing the instant cause, because the matter was ripe and the trial court was duty-bound to decide all the issues properly before it. *See Bellegie v. Texas Bd. of Nurse Examiners,* 685 S.W.2d 431, 434 (Tex.App.1985, writ ref'd n.r.e.). We reversed the judgment of dismissal and remanded the matter to the trial court for further proceedings and rendition of a final declaration of all matters in issue. Because a dismissal does not operate as an adjudication, we held that the attempt to decide one issue was of no legal effect in light of dismissal of the entire cause, and we thus declined to render what we believed to be an advisory opinion on a matter not properly before this Court.

The Supreme Court, however, reversed our decision and remanded the cause to this Court. *Lone Star Gas Co. v. R.R. Comm'n of Texas,* 767 S.W.2d 709 (Tex. 1989). Although the Supreme Court recognized that the trial court had dismissed the case below, we were directed to ignore what it termed an "inconsistency" and were instructed that we were obliged to render an opinion on whether the rules were valid despite the posture of the case. We question whether doing so complies with Tex.R.App.P.Ann. 81(c) and 90(a) (Supp.1990). Nevertheless, in reviewing the matter, we will sustain appellants' challenge to the rules and reverse the judgment of the trial court.

Appellants requested a ruling as to the validity of certain of the Commission's "ratable take" and "proration" rules governing the natural gas industry. *See* Tex. R.R. Comm'n Rules, 12 Tex.Reg. 536 (1988) (to be codified at 16 Tex.Admin.Code §§ 3.30(a)(1), (5) and 3.34(h)(2–4) (since amended)). These rules were promulgated in response to the creation of special marketing programs (SMPs). SMPs are affiliates of larger companies that are able to buy gas in circumvention of established contracts and Commission policies applicable to the larger companies.

Section 30(a)(1) of the Commission rules defines a "first purchaser" as "the first purchaser of natural gas produced from a well," but adds "[a] first purchaser and any affiliate of the purchaser that transports

any natural gas it purchases from a well by use of the same pipeline system used by the first purchaser of which it is an affiliate shall be treated as a single first purchaser for purposes of ratability requirements," unless the affiliate is a special marketing program under section 34(h).

Section 30(a)(5) defines an affiliate as a "person or entity that owns, is owned by, or is under common ownership with another person or entity to the extent of 50% or more or that otherwise controls or is controlled by another person or entity," adding "affiliates of a common entity are also affiliates of each other," and listing certain exceptions.

Section 34(h) sets out the scheme for qualifying an affiliate as a separate first purchaser by designating the affiliate as an SMP. The section requires:

(2) Each and every special marketing program offer to purchase gas must be made without discrimination within a field and without unjust or unreasonable discrimination between fields to all operators for all wells on the pipeline system of the affiliated first purchaser from which that affiliated first purchaser has been purchasing and accepting delivery of gas as a first purchaser. The offer must also be made for all first, second and third priority category gas on the affiliated first purchaser's pipeline system which it has been purchasing and accepting for delivery under an obligation to purchase and accept delivery from the tailgate of a plant processing gas to extract liquids, or from a gathering system that purchases from wells and is required by contract or by its physical connections to sell its gas entirely to the affiliated first purchaser, whether or not those purchases were made as a first purchaser.

(3) It is unreasonably discriminatory, and therefore prohibited, for the offer to purchase gas in the special marketing program, or for any release of gas for sale in the special marketing program to require release of any claims under any existing contract other than a release of the gas for sale in the special marketing program or a requirement of a volume-for-volume basis for gas taken in the special marketing program to be credited against any existing contract, if the credit provision is limited to the period of actual participation in the special marketing program. Nothing in this paragraph shall prohibit an operator of any well from offering terms inconsistent with these provisions. The making of an offer which is not accepted shall not affect rights under existing contracts.

(4) If the well producing priority category 1, 2 or 3 gas is shut in or curtailed, and waste is found by the Commission to exist, neither a special marketing program purchaser nor its affiliated first purchaser may purchase lower priority category gas until all the priority category 1, 2 and 3 gas is taken and resulting waste is prevented. The Commission shall expedite determination of waste, and may enter an emergency, temporary or interim order upon affidavit proof that waste is occurring.[1]

The trial court judgment states that "the Commission did not exceed its lawful authority in enacting, adopting, and implementing the rules under attack herein."

Appellants complain that the district court erred in declaring the challenged rules valid because: (1) the rules are beyond the Commission's statutory authority; (2) the rules are inconsistent with the statutes; (3) the statutes provide no guidelines or standards governing the Commission's jurisdiction in this subject matter, resulting in an unconstitutional delegation of legislative power; (4) the rules are contrary to the public policy of Texas and the United

---

**1.** The Commission amended Rule 34(h)(3) so that it prohibits an offer to a producer to participate in a special marketing program to "require modification of any existing contract provisions," except a volume-for-volume credit against the particular contract from which gas is released for sale to the SMP. 12 Tex.Reg. 4325 (Nov. 20, 1987); 134 Tex.Reg. 838 (Feb. 12, 1988). The Commission amended Rule 34(h)(4) so that a waste complaint must be accompanied by supporting documentation and a statement that all documents filed have been served on the first purchaser and any affiliated SMP. 12 Tex. Reg. 2860–2861 (Aug. 25, 1987).

States and are preempted by federal statute; and (5) the rules deprive appellant of state and federal constitutional rights to due process and equal protection of the laws. We will dispose of the state law grounds before reaching appellants' federal constitutional claims. *See Hagans v. Lavine*, 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974); *Southern Nat'l Bk. of Houston v. City of Austin*, 582 S.W.2d 229, 235 (Tex.Civ.App.1979, writ ref'd n.r. e.).

Appellant Lone Star is both an intrastate and an interstate pipeline company. It seeks a declaration as to the applicability of the rules to its intrastate pipeline system. Appellant Enserch Gas Company (Enserch) is a gas marketing company that utilizes the Lone Star pipeline system to make deliveries to its customers. Both are wholly-owned by Enserch Corporation. Enserch Gas purchases gas from the spot market, i.e., gas that is not dedicated to long-term gas contracts and is available for immediate sale. The spot market price of gas is much lower than the long-term contract price. Enserch often purchases gas from operators who have long-term contracts with Lone Star. Just as often, however, it purchases from operators with whom Lone Star has had no relationship. Lone Star has conditioned the release of gas contractually dedicated to it for sale to Enserch, upon an agreement from the operator that gas sold to Enserch would be credited to Lone Star's take obligation. Enserch will then purchase the released gas. Lone Star and Enserch both sell gas to local gas utilities.

■ First, appellants complain that the challenged rules are beyond the Commission's statutory authority. The Commission has been granted broad discretion in administering the laws regarding natural gas regulation. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). We are obligated to hold that the rules are valid if constitutional, within the power granted to the Commission, and promulgated pursuant to the proper procedure. *Helle v. Hightower*, 735 S.W.2d 650, 654 (Tex.App.1987, writ denied). We presume the rules are valid, particularly where they have been adopted following notice and public hearing. *Trapp v. Shell Oil Co.*, 145 Tex. 323, 198 S.W.2d 424, 439 (1946); *see also Bullock v. Hewlett–Packard Co.*, 628 S.W.2d 754, 756 (Tex.1982); *Texas Liquor Control Bd. v. Attic Club, Inc.*, 457 S.W.2d 41, 43 (Tex.1970).

■ The Commission's statutory authority is derived from legislative delegations of authority codified in the Texas Natural Resources Code. Texas Nat.Res. Code Ann. § 86.041 (1978) states:

> The Commission has broad discretion in administering the provisions of this chapter and may adopt any rule or order in the manner provided by law that it finds necessary to effectuate the provisions and purposes of this chapter.

For example, the Commission may proscribe practices it determines to be wasteful, even if those practices are not statutorily proscribed. *Railroad Comm'n v. Shell Oil Co.*, 146 Tex. 286, 206 S.W.2d 235, 241 (1947). Indeed, the Commission has an affirmative duty to prevent waste and conserve gas. *Railroad Comm'n v. Rowan Oil Co.*, 152 Tex. 439, 259 S.W.2d 173, 176 (1953). The Commission states in its preamble to the rules that they are adopted pursuant to section 81.052, granting the Commission general rulemaking authority; section 85.202, relating to the conservation of oil and gas and prevention of waste of oil and gas; section 86.041, further authority for prevention of waste and conservation of gas; and sections 111.083, 111.090, and 111.133 (the Common Purchaser Act), relating to purchases and takes by common purchasers without discrimination or the use of monopolistic practices.

■ The Commission promulgated the challenged rules to protect priority schemes concerning nominations, purchases, and the production of gas following the advent of SMPs. These schemes in turn assure that casinghead gas, oil, and special allowable wells continue producing. The rules enhance the Commission's ability to regulate waste, promote conservation, protect correlative rights, prevent discrimination, and encourage production by purchas-

ers and their SMP affiliates. The rules are in harmony with the general objectives of the act involved. *See Gerst v. Oak Cliff Sav. and Loan Ass'n*, 432 S.W.2d 702, 706 (Tex.1968); *Jefco, Inc. v. Lewis*, 520 S.W.2d 915, 921 (Tex.Civ.App.1975, writ ref'd n.r. e.). The Commission may refuse to consider affiliates to be separate first purchasers in order to promote its protective scheme.

 Second, appellants complain that the challenged rules are inconsistent with the statutes cited by the Commission as authority to promulgate the rules. We hold that the questioned rules are consistent with statutes aimed at preventing waste, protecting correlative rights, and preventing discrimination. The Commission's long-established rules and policies were designed and implemented to achieve those goals, and the Commission has demonstrated that without the challenged rules the protective scheme to effectuate those goals will be circumvented. Appellants vigorously complain that the rules cannot be valid because there has been no evidentiary hearing in which the Commission found Lone Star to have encouraged waste or to have discriminated in purchasing gas. It is well-settled that, because the Commission is charged with supervising gas production, it has the "power to devise some reasonably definite plan or pattern to start with." *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 80 (1939). Because the rules provide a procedure to obtain variances, the rules are not beyond the Commission's power to promulgate. *Gulf Land Co.*, 131 S.W.2d at 80. We note further that the Commission is specifically permitted to act by rule. *See* Tex.Nat.Res.Code Ann. §§ 81.052, 85.201, 85.202(b), 86.041, 86.042, 111.090, and 111.-133 (1978 & Supp.1990). The questioned rules are consistent with statutes relied upon by the Commission.

 Third, appellants complain that the statutes upon which the Commission relies for rulemaking authority in this instance contain no standards for the exercise of such authority. Specifically, appellants complain that the statutes do not define "affiliate," indicate that affiliated first pur-

chasers may be treated as single first purchasers, or "define the concept of discrimination as encompassing the content of contractual negotiations."

 The delegation doctrine requires that the statute relied upon by a regulatory agency set forth the policy of the state as adopted by the legislature and establish the primary standards to which the government and the public must adhere. *Southwestern Sav. & Loan Ass'n v. Falkner*, 160 Tex. 417, 331 S.W.2d 917, 921 (1960). This standard may be broad where conditions that cannot be conveniently investigated by the legislature must be considered. *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961, 964 (1945); *Housing Auth. of the City of Dallas v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 87 (1940). The agency may adopt rules within the parameters of the general policy defined by the legislature. *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935).

 The legislature's failure to address specific unforeseen circumstances in the statutes that delegate authority to the Commission does not render the statutes invalid for "want of standards." To require that legislation address each possible exercise of agency power would defeat the purpose of delegating legislative authority. *See Corzelius*, 186 S.W.2d at 964. The standards here are found in the statutes directing the Commission to prevent waste, promote conservation, and protect correlative rights. The Commission has exercised its constitutionally delegated authority in implementing the challenged rules.

 Fourth, appellants complain that the challenged rules contravene state and federal public policies and are preempted by federal law. Appellants reason that any regulatory action having the direct or indirect effect of increasing the prices appellants pay for gas is against public policy. While regulations causing unreasonably high price increases have been successfully challenged, price is only one factor to be considered in evaluating whether a statute promotes public policy.

Appellants offered no evidence that the challenged rules cause such unreasonably high price increases that the rules contravene public policy, and the Commission offered evidence that other public policy interests would be promoted by implementation of the challenged rules.

Appellants argue that the rules in question have been preempted by both the Natural Gas Act, 15 U.S.C.A. §§ 717–717w (West 1976 & Supp.1990) (NGA), and the Natural Gas Policy Act of 1978, 15 U.S.C.A. §§ 3301–3432 (West 1982 & Supp. 1990) (NGPA)[2]. It is clear that a finding of preemption is not favored, and it should not be made in the absence of persuasive reasons. *Chicago & North Western Transp. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981). Moreover, a presumption exists against finding preemption of state law in areas traditionally subject to state regulation. *California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Nevertheless, we must reach such a conclusion in this instance.

Before the NGPA's passage, interstate natural gas transportation and sales were subject to the NGA. The NGA established an intricate price control system to regulate the transport and sale of gas in interstate commerce. "Interstate commerce" is defined in the NGA as "commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States." 15 U.S.C.A. § 717a(7). It thus established a comprehensive scheme to govern all interstate gas transactions. *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 91, 83 S.Ct. 646, 650, 9 L.Ed.2d 601 (1963). The NGA did not apply to "the production or gathering of natural gas." 15 U.S.C.A. § 717(b). That function was reserved for the states. *Interstate Natural Gas Co. v. Federal Power*

*Comm'n*, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947).

The United States Supreme Court has held that under the NGA, state regulation of purchasers is completely preempted and, therefore, any such regulation is void. *Northern Natural*, 372 U.S. at 92, 83 S.Ct. at 651. In *Northern Natural*, the Kansas Corporation Commission had promulgated regulations requiring interstate pipeline companies to purchase gas ratably from all wells connected to their pipeline system in each field within the state. The regulation implemented a Kansas statute that empowered the Commission to regulate gas production so as to prevent discrimination against gas producers and encourage gas conservation. The Supreme Court held that because the regulations were directed at gas purchasers subject to federal regulation, the fact that the regulations were intended to promote natural gas conservation was immaterial. *Northern Natural*, 372 U.S. at 92, 83 S.Ct. at 651. The Court held that both direct price regulation and regulations affecting interstate gas prices were preempted and therefore void. *Northern Natural*, 372 U.S. at 91, 83 S.Ct. at 650.

After the energy shortages of the 1970s, Congress perceived the need to permit market forces to affect natural gas prices. To this end, it passed the Natural Gas Policy Act of 1978. *Transcontinental Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 420, 106 S.Ct. 709, 715, 88 L.Ed.2d 732 (1986). The NGPA substantially reduced the level of federal gas regulation. Most categories of gas have now been deregulated by operation of the NGPA. *See F.E.R.C. v. Martin Exploration Management Co.*, 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988); 15 U.S.C.A. § 3331. However, rather than reflecting a wholesale retreat from the gas regulation field, the NGPA expands federal control in many respects because it delegates

---

**2.** Appellants' third point of error is divided into five subparts. Subpart (E), with which we are concerned, argues that the challenged rules are against the public policy of Texas, the public policy of the United States, and are preempted

by federal law. The point is multifarious. Tex. R.App.P.Ann. 74(d) (Supp.1989). Nevertheless, we are directed to determine whether the rules are valid. We will consider the point of error.

regulatory authority over intrastate transactions to the Federal Energy Regulatory Commission. *Transco,* 474 U.S. at 421, 106 S.Ct. at 716. It also preserves the NGA pricing structure over "old" gas.[3] 15 U.S.C.A. § 3431. FERC is given the power to set the rates and prices by which most intrastate transactions take place. 15 U.S.C.A. § 3371(a)(2) and (b)(2). This section is implemented by the FERC at 18 C.F.R. §§ 284.1–284.305 (1989).

■ The Supreme Court has consistently held that under the NGPA, federal law preempts state attempts to regulate gas prices by regulating natural gas purchasers. *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas,* 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989); *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988); *Transco,* 474 U.S. at 423, 106 S.Ct. at 717. States may continue to regulate production in a manner that incidentally affects purchasers' costs. *Northwest Pipeline,* 109 S.Ct. at 1277; *Schneidewind,* 485 U.S. at 308, 108 S.Ct. at 1155. However, the NGPA preempts such production regulations if the regulations have an impact on matters within federal control and are not an incident of efforts to achieve a "proper state purpose." *Northwest Pipeline,* 109 S.Ct. at 1277.

The *Transco* Court applied three factors to decide whether the challenged state natural gas regulations were preempted. These are: (1) whether the regulation comes within the limits of the comprehensive federal regulatory scheme; (2) whether the state regulation conflicts with the federal interest, expressed by both Acts, in protecting gas consumers by ensuring low gas prices; and (3) whether the regulation is directed at purchasers. *Transco,* 474 U.S. at 420, 423, 106 S.Ct. at 715, 717. Thus, in *Transco,* Mississippi's regulation requiring gas purchasers to take gas ratably and without discrimination from all producers in a gas pool was held to be preempted. In *Schneidewind,* the Court

held that Michigan's attempt to require an interstate pipeline to obtain approval of its Public Service Commission before issuing long-term securities was preempted because the clear object of the statute was to regulate gas rates. *Schneidewind,* 485 U.S. at 308, 108 S.Ct. at 1155. In *Northwest Pipeline,* however, the challenged Kansas regulation that canceled producers' production allowables where the actual production was far below the allowable was upheld on the grounds that Kansas was regulating producers and that the regulation had negligible price effects. *Northwest Pipeline,* 109 S.Ct. at 1262.

■ Appellees argue that the regulations are designed to prevent waste, promote conservation, and protect correlative rights. These are proper state purposes. Where a state regulates producers to attain these goals, the incidental effect on purchasing decisions does not generally result in a finding of preemption. *Northwest Pipeline,* 109 S.Ct. at 1278. However, as noted above, federally-regulated purchasers may not be made the subject of state regulation. Lone Star is a federally-regulated purchaser because it is an intrastate pipeline that sells to both interstate pipelines and to local distribution companies served by interstate pipelines. 15 U.S.C.A. § 3371(b)(2)(A)(i) and (ii). Although Enserch is not directly regulated, it purchases in a market that is partially regulated.

■ Appellees further argue that because production and sales are part of an "integrated system," the state validly may take measures to affect a pipeline's capacity in order to prevent waste by producers. Thus, claim appellees, although the challenged rules strictly regulate how SMPs and their affiliates purchase surplus gas, the rules affect production and are therefore within the sphere of permissible state regulation. *See* 12 Tex.Reg. 536–37. This argument fails for several reasons. First, the argument concedes that purchasers are regulated. Second, even though the challenged regulations may regulate producers,

---

**3.** "Old gas," for the purpose of discerning whether the NGA is applicable, is that gas which was committed or dedicated to interstate com-

merce as of November 8, 1978. 15 U.S.C.A. § 3431(a)(1)(A).

the regulations also create higher gas prices in the spot markets in which SMPs operate.[1] They therefore constitute an improper state purpose under *Northwest Pipeline.* Third, they regulate matters within the federal purchasing regulatory scheme. Appellee's argument that the regulations are production-oriented only is therefore belied. The regulations fly squarely in the face of the criteria utilized by the Supreme Court in *Northwest Pipeline.*

Appellees argue that the challenged regulations do not restrict the amount of gas available to qualified separate first purchasers. As a result, they conclude, the regulations do not distort the market by restricting supply and, thus, increasing price. We disagree. Rule 30(a)(1) combines an SMP and its affiliate pipeline into a single first purchaser if the SMP transports any gas it purchases on its affiliate's pipeline. The consequence of first purchaser status for Enserch is that its ability to buy low cost spot market gas for which it has willing buyers is limited to Lone Star's ability to buy high cost long term gas for which Lone Star has no market.

The only alternative is for Enserch to qualify under Rule 34(h), in which case "each and every" one of its offers to purchase gas must be made to all operators on Lone Star's system from which Lone Star has been buying gas. Rule 34(h)(2). Enserch and Lone Star are both prohibited from seeking significant take-or-pay or price concessions (Rule 34(h)(3)), and Enserch and Lone Star are both prohibited from buying low cost, low priority gas until all high cost, high priority gas on the system is purchased (Rule 34(h)(4)). Although these rules do not restrict Enserch's purchases exclusively to Lone Star's system, so long as every Enserch offer is made to everybody on Lone Star's system, these restrictions constitute a prohibition against a significant amount of otherwise permissible natural gas purchases. We reject the contention that the regulations do not restrict the quantity of available gas supplied.

Appellees rely on *Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 76

---

**4.** In determining that the Railroad Commission intended to maintain increased spot market prices, we have looked to several sources. First, trial testimony establishes the fact. Former Commissioner Clark Jobe testified that the regulations were adopted to address the problem of too much market leverage being exercised by purchasers. Moreover, we have looked to the statement accompanying the rule. *See* Beal, *The Scope of Judicial Review of Agency Rulemaking: The Interrelationship of Legislating and Rulemaking in Texas,* 39 Baylor L.Rev. 597, 677 (1987). The agency has stated, "[t]he sections are not intended to affect or influence the price of gas." They also state, however, "[i]t is the intent of the Commission that any offers resulting in curtailment or shutting in of gas ... may be reviewed by the Commission to determine if the offers have resulted in waste." It also states, "[t]hat the section requires ratable production and purchases to be based on actual market demand." But the regulations make a quantity of gas demanded by a segment of purchasers unpurchasable. "Actual market demand," as stated here, necessarily means the state-altered demand, which is another way of stating that purchases are to occur in a Texas-determined market structure. Finally, we have looked to other agency rules bearing on the same subject. "In ascertaining the intent of the agency, all rules of an agency bearing on the same subject are to be considered and given effect." *Id.* We

note that Commission Rules 30, 34, 64, 65, and 68 are the only Railroad Commission rules that regulate purchasers to any significant degree. Other than Rules 30 and 34, these rules plainly affect producers only to the extent necessary to control waste and encourage conservation. Other commission rules control the gas production side of the Texas natural gas market, *e.g.,* Rule 31 (gas well allowables) and Rules 101–104 (NGPA operator permit process). Rule 30, however, puts extensive burdens on first purchasers. They must nominate the quantity of gas to be taken from each operator, in order to permit the Commission to "determine demand and set allowables for ratable production not exceeding market demand." Rule 30(d). Moreover, first purchasers are obligated to nominate no more than "anticipated market demand for gas on the pipeline system of the initial nominator for the month for which the nomination is made." Rule 30(e). Purchasers must also strictly nominate for the purchases of the majority of their downstream purchasers. Rule 30(f) obligates purchasers to buy on terms that "ratably apportion without unjust or unreasonable discrimination" as between fields where they purchase gas. The agency's statements, Commissioner Jobe's testimony, and the requirements imposed by other rules all lead to the conclusion that there is no purpose for the challenged rules other than to drive prices up by restricting the quantity of gas supplied.

L.Ed.2d 497 (1983), for the proposition that state regulation may be lawful as to gas purchased by intrastate pipelines when the same regulation is preempted as to gas purchased by interstate pipelines. The facts presented in *Eagerton* are distinguishable from those in the present case. There, the purpose of the statute was to protect consumers from an increase in gas costs, a purpose specifically approved by Congress. The statute challenged in *Eagerton* increased the severance tax on natural gas, but prohibited the flow-through of the tax increase to consumers. The Court held that this statute was consistent with § 105 of the NGPA which allows the states to protect consumers from rising gas costs by establishing price ceilings below the ceilings set by the NGPA. *Eagerton*, 462 U.S. at 186, 103 S.Ct. at 2303.

The challenged rules come within the limits of the comprehensive NGPA scheme, they conflict with the federal interest in low gas prices, and they seek to regulate purchasers covered by the NGPA. As a result, Rules 30(a)(1) and (5), and 34(h)(2), (3), and (4) are preempted by federal law. By virtue of clause 2, Article VI of the United States Constitution, we hold the rules are therefore invalid.[5] Appellants' third point of error is sustained to the extent that it complains the rules are preempted by federal law.

Because of our disposition, it is unnecessary to address appellants' remaining arguments. The judgment of the trial court is reversed and judgment is rendered that the challenged rules are declared invalid.

5. Although the parties have failed to bring two cases to our attention, we wish to distinguish our decision from those reached by the First Court of Appeals in *Gulftide Gas Corp. v. Cox*, 699 S.W.2d 239 (Tex.App.1985, writ ref'd n.r.e.) and this Court in *Bullock v. Enserch Exploration, Inc.*, 614 S.W.2d 215 (Tex.Civ.App.1981, writ ref'd n.r.e.), cert. denied, 455 U.S. 946, 102 S.Ct. 1445, 71 L.Ed.2d 659 (1982).

In *Gulftide*, a gas transmission company sued a gas producer for breach of contract, fraud, and breach of fiduciary duty in their gas purchase contract. The First Court of Appeals held that the federal regulatory scheme did not preempt the authority of state courts to determine the validity of gas purchase contracts. This holding does not conflict with our decision today. In *Gulftide*, the court relied upon federal authority for the proposition that state courts may determine the validity of contract escalations under state law. *See Pennzoil Co. v. Federal Energy Regulatory Comm'n*, 645 F.2d 360 (5th Cir.1981). We do not doubt that a state court may determine if a gas purchase contract is a valid con-

tract under principles of state law. Whether the negotiated transaction is void under state regulations is a different issue.

Also, in *Bullock v. Enserch Exploration, Inc.*, this Court held that a federally-regulated interstate gas pipeline is subject to state franchise taxes for that proportion of gas it sells for resale out of state. There, we stated, "[i]n setting up these regulations Congress clearly intended that the price of natural gas would reflect the reasonable costs of its production and transportation." 614 S.W.2d at 219. We held that one such cost was to pay for state services supplied to the industry. Thus, the tax was permissible. Here, however, purchasers are required to shoulder a burden that the unrestricted market would not impose, namely, the burden of foregoing a significant percentage of potential gas purchases. An unrestricted market would have created a cost burden for the services supplied to the industry that we considered in *Enserch*. To that extent, the tax in *Enserch* is not akin to the regulations we consider today.